UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NORTH STAR INDUSTRIES, INC.,

                                    Plaintiff,                    **OPINION & ORDER**

        - against -                                               No. 24-CV-4580 (CS)

LOCAL 854 PENSION FUND,

                                    Defendant.
------------------------------------------------------------x

Appearances:

Jennifer S. Smith
Law Offices of Jennifer Smith PLLC
New York, New York
*Counsel for Plaintiff*

Daniel Treiman
Friedman & Anspach
New York, New York
*Counsel for Defendant*

Seibel, J.

        Before the Court is the motion of Plaintiff North Star Industries, Inc. ("Plaintiff" or

"North Star"), (ECF No. 25), seeking an order (1) granting it partial summary judgment, (2)

directing Defendant Local 854 Pension Fund ("Defendant" or the "Old Plan") to calculate the

appropriate amount of assets to transfer under 29 U.S.C. § 1415(g)(1), (3) ordering the Old Plan

to execute the § 1415 transfer of pension liabilities and appropriate assets, (4) directing the Old

Plan to reduce North Star's withdrawal liability in accordance with that statute, (5) finding any

appropriate material facts for which there is no genuine dispute, (6) staying this action pending

completion of related arbitration proceedings, and (7) awarding reasonable attorneys' fees and

costs to Plaintiff in connection with the instant motion.  For the reasons stated below, the motion

is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.    Facts

I assume the parties' familiarity with the record and therefore only briefly summarize the

background and procedural history leading up to this motion.  The following facts are taken from

the parties' Local Civil Rule ("LR") 56.1 Statements and are undisputed for the purposes of this

motion unless otherwise noted.

Plaintiff North Star is a trucking company based in New York State.  (D's Resp. ¶¶ 1-2.)[1]

Defendant Old Plan is a multiemployer defined benefit pension plan as defined under the

Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001

*et seq.*[2]  (*Id.* ¶¶ 7-9.)  Before May 31, 2020, North Star participated in the Old Plan through a

collective bargaining agreement ("CBA") with the International Brotherhood of Teamsters Local

553 (the "Old Union"), (*id.* ¶ 3), which required North Star to contribute to the Old Plan for

employees who performed work covered by the CBA, (*id.* ¶ 6).  Accordingly, North Star

employees who were members of the Old Union earned pension credits – based on North Star's

contributions to the Old Plan under the CBA – and participated in the Old Plan, (*id.* ¶ 13).  On or

about November 2, 2020, however, the Old Union disclaimed interest in representing North

Star's employees, (*id.* ¶ 4), which triggered North Star's involuntary complete withdrawal from

the Old Plan, (*id.* ¶ 15).

---

[1] "D's Resp." refers to Defendant's response to Plaintiff's LR 56.1 statement (ECF No. 30).

[2] The Court refers to ERISA sections by their numbering in Title 29 of the United States Code.

On or about August 25, 2021, the National Labor Relations Board ("NLRB") certified the results of North Star's employees' election to join the Amalgamated Transit Workers Local 854 ("ATW") Union.  (*Id.* ¶ 16.)  As a result of that NLRB-certified election, North Star began contributing to the ATW Pension Fund (the "New Plan") on behalf of its employees.  (*Id.* ¶ 18.) The New Plan is also a multiemployer defined benefit pension plan as defined under ERISA. (*Id.* ¶¶ 19-20.)

In a letter dated September 9, 2021, the Old Plan notified North Star that North Star had completely withdrawn based on its cessation of obligations to the Old Plan and assessed North Star's initial withdrawal liability to the Old Plan as $39,757, plus interest.  (ECF No. 26-9; *see* D's Resp. ¶¶ 21-23.)

On or about January 6, 2022, the Old Plan advised the Pension Benefit Guaranty Corporation ("PBGC") that it had experienced a mass withdrawal as of the plan year ending August 31, 2021.  (D's Resp. ¶ 24.)  In a letter dated February 28, 2022, the Old Plan notified North Star that it was liable for redetermination liability totaling $50,000, plus interest.  (ECF No. 26-11; *see* D's Resp. ¶ 25.)  In a letter dated August 29, 2023, the Old Plan notified North Star that it was also liable for reallocation liability totaling $248,236.  (ECF No. 26-12; *see* D's Resp. ¶¶ 26-27.)  The Old Plan's letters to North Star each set out installment payment schedules.  (ECF Nos. 26-9, 26-11, 26-12.)

Both parties agree that the statutory requirements to commence a transfer of pension liabilities and assets concerning North Star from the Old Plan to the New Plan under § 1415(a) have been met, but the Old Plan has not executed the transfer because North Star challenges the amount of assets that the Old Plan proposed to transfer.  (D's Resp. ¶¶ 28-29.)

### B.    <u>Procedural History</u>

On June 15, 2024, North Star commenced this lawsuit, asserting that:  (1) the Old Plan must execute the transfer of pension assets and liabilities to the New Plan under 29 U.S.C. § 1415; (2) the Old Plan must estimate the reduction of North Star's withdrawal liability under 29 U.S.C. § 1391(e) and adjust the interim payment schedule accordingly; and (3) the Old Plan must offset North Star's withdrawal liability under 29 U.S.C. § 1415(c) – that is, reduce North Star's withdrawal liability to the Old Plan by an amount equal to the excess of unfunded vested benefits transferred to the New Plan over the assets the Old Plan transferred to the New Plan – and refund any withdrawal liability overpayments.  (*See* ECF No. 1 ¶¶ 77-94; *see also id.* at 14.) On or about June 16, 2024, North Star commenced an arbitration proceeding with the American Arbitration Association, disputing the Old Plan's withdrawal liability assessments.  (D's Resp. ¶¶ 30-31; *see* ECF No. 26-13.)  That arbitration is ongoing.  (*See* ECF No. 27 ("P's Mem.") at 16-17; ECF No. 29 ("D's Opp.") at 16; ECF No. 31 ("P's Reply") at 10.)

On July 22, 2024, the Old Plan filed its Answer, (ECF No. 11), and on October 17, 2024, the Court held a conference to discuss the status of the case, (*see* Minute Entry dated Oct. 17, 2024).  The parties filed a joint status report on October 29, 2024, (ECF No. 20), and at a subsequent conference the Court set a schedule for pre-motion letter briefing on the issue of the proper interpretation of § 1415(g)(1), (*see* Minute Entry dated Oct. 31, 2024).  After reviewing the letter-briefs, (ECF Nos. 21-23), the Court ordered the parties to submit full briefing on an expedited schedule, (ECF No. 24).  The instant motion followed.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3]  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor.").  "In considering a motion for summary judgment, the Court cannot render credibility assessments, which are reserved for the jury."  *Jordan v. Gifford*, No. 19-CV-1628, 2022 WL 3106965, at *21 (D. Conn. Aug. 4, 2022), *adhered to on reconsideration*, 2023 WL 2895883 (D. Conn. Apr. 11, 2023).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and the non-movant "may not rely on conclusory allegations or

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

## III.    DISCUSSION

### A.    ERISA's Statutory Framework

I assume the parties' familiarity with ERISA's statutory framework and the Multiemployer Pension Plan Amendments Act ("MPPAA"), which I discussed at length in *Mar-Can Transp. Co. v. Loc. 854 Pension Fund*, 722 F. Supp. 3d 355, 365-77 (S.D.N.Y. 2024).  I incorporate that discussion here and expand on it as relevant.

As explained in *Mar-Can*, Part 1 of Subtitle E of ERISA, 29 U.S.C. §§ 1381-1405, governs withdrawal liability, applying "if an employer withdraws from a multiemployer plan." *See id.* at 366. Part 1 provides a complex scheme for calculating an employer's withdrawal liability. *See Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196-97 (1997); *Iron Workers Dist. Council of S. Ohio & Vicinity Pension Fund v. Lykins Reinforcing, Inc.*, 484 F. Supp. 3d 544, 548 (S.D. Ohio 2020). The methods for computing withdrawal liability are found in §§ 1389-1393 and 1405. *See T.I.M.E.-DC, Inc. v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 944 (2d Cir. 1985). Specifically, "[a]n employer's 'withdrawal liability' is defined as 'the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits,' adjusted according to four statutory provisions, if applicable." *Mar-Can*, 722 F. Supp. 3d at 366 (quoting 29 U.S.C. § 1381(b)). "Thus, Section 1391 is the primary section that sets forth how withdrawal liability should be calculated." *Hoeffner v. D'Amato*, No. 09-CV-3160, 2016 WL 8711082, at *3 (E.D.N.Y. Sept. 30, 2016). Section 1399 provides both the notice requirements and the rules for collection of withdrawal liability payments. *See T.I.M.E.-DC*, 756 F.2d at 944 (citing 29 U.S.C. § 1399).

A mass withdrawal occurs when all employers withdraw from or cease their obligations to contribute to a multiemployer pension plan. *See Trs. of Leather Goods, Handbags, & Novelty Workers' Union Loc. 1 Joint Ret. Fund v. Cent. Fur Storage Co.*, No. 18-CV-7224, 2019 WL 3937132, at *6 (E.D.N.Y. Aug. 2, 2019), *report and recommendation adopted*, 2019 WL 3936676 (E.D.N.Y. Aug. 20, 2019).[4] "Mass withdrawal liability is simply an extension of

---

[4] ERISA's text does not contain a definition for "mass withdrawal." Rather, the PBGC's regulation defines the term as follows: "Mass withdrawal means: (1) [t]he withdrawal of every

withdrawal liability, but modifies the method for calculating the amount of liability and imposes additional procedures in light of the changed incentives to employers and needs of the plan that arise when no employers continue to participate actively." *UFCW Loc. 174 Pension Fund v. 5600 Mkt. Corp.*, No. 17-CV-5789, 2018 WL 4403394, at *6 (E.D.N.Y. Aug. 16, 2018), *report and recommendation adopted as modified*, 2018 WL 4388452 (E.D.N.Y. Sept. 14, 2018).

The PBGC's regulations explain how to proceed when a mass withdrawal occurs. *See id.* (first citing 29 C.F.R. §§ 4219.11 - 16, then citing 29 C.F.R. § 4219.2). When a plan determines it has experienced a mass withdrawal, the plan must first determine the initial withdrawal liability of each withdrawing employer for whom the liability has not been previously determined, notify each employer of the amount of the initial withdrawal liability, and collect the amount of the initial withdrawal liability from each employer. *See* 29 C.F.R. § 4219.11(a); *see also* 29 U.S.C. §§ 1382(2), (3). The plan must also notify employers that a mass withdrawal has occurred and determine each employer's "'mass withdrawal liability,' which accrues in addition to initial withdrawal liability and consists of redetermination liability and reallocation liability." *Trs. of Leather Goods*, 2019 WL 3937132, at *6 (first citing 29 C.F.R. § 4219.2(b), then citing §§ 4219.11(a)-(b)); *see 5600 Mkt. Corp.*, 2018 WL 4403394, at *5 (citing 29 U.S.C. § 1399(c)(1)(D)).

"Redetermination liability" is defined as "the sum of an employer's liability for *de minimis* amounts and the employer's liability for 20-year-limitation amounts." 29 C.F.R. § 4219.2(b). The former refers to "the amount by which the employer's allocable share of unfunded vested benefits for the purpose of determining its initial withdrawal liability was

---

employer from the plan, (2) [t]he cessation of the obligation of all employers to contribute under the plan, or (3) [t]he withdrawal of substantially all employers pursuant to an agreement or arrangement to withdraw." 29 C.F.R. § 4001.2.

reduced pursuant to [29 U.S.C. § 1389(a)-(b)]," 29 C.F.R. § 4219.13, and the latter refers to any amounts that had been previously excluded from the employer's initial withdrawal liability based on the twenty-year limitation provided by 29 U.S.C. § 1399(c)(1)(B), *see* 29 C.F.R. § 4219.14; *Trs. of Leather Goods*, 2019 WL 3937132, at *6; *5600 Mkt. Corp.*, 2018 WL 4403394, at *6.[5]

"Reallocation liability" means "'the amount of unfunded vested benefits allocated to an employer in the event of a mass withdrawal.'" *5600 Mkt. Corp.*, 2018 WL 4403394, at *6 (quoting 29 C.F.R. § 4219.2(b)).  The detailed method for calculating reallocation liability is set forth in 29 C.F.R. § 4219.15.  *See id.*  Under that regulation, "the amount of a plan's unfunded vested benefits to be reallocated shall be the amount of the plan's unfunded vested benefits, determined as of the mass withdrawal valuation date," subject to adjustments for uncollectible

---

[5] Section 1389 contains a *de minimis* rule:

> Except in the case of a plan amended under subsection (b), the amount of the unfunded vested benefits allocable under section 1391 of this title to an employer who withdraws from a plan shall be reduced by the smaller of –
>
> (1) ¾ of 1 percent of the plan's unfunded vested obligations (determined as of the end of the plan year ending before the date of withdrawal), or
>
> (2) $50,000,
>
> reduced by the amount, if any, by which the unfunded vested benefits allowable to the employer, determined without regard to this subsection, exceeds $100,000.

29 U.S.C. § 1389(a).  This rule "is intended to eliminate or reduce the withdrawal liability certain employers – generally smaller companies – would owe, to the extent that their calculated withdrawal liability is less than $150,000."  *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 143 n.9 (4th Cir. 2019).  The *de minimis* rule does not apply when a plan experiences a mass withdrawal.  *See* 29 U.S.C. § 1389(c).

Section 1399(c) provides that withdrawal liability payments are limited by a twenty-year amortization schedule.  29 U.S.C. § 1399(c)(1)(B); *see Manhattan Ford Lincoln, Inc. v. UAW Loc. 259 Pension Fund*, 331 F. Supp. 3d 365, 383 n.33 (D.N.J. 2018) ("[T]he employer's withdrawal liability is not eternal.  ERISA provides that any remaining balance is forgiven after the employer has made required annual payments for 20 years."), *appeal dismissed by*, No. 18-2709, 2018 WL 10759131 (3d Cir. 2018).  But that provision does not apply when there has been a mass withdrawal.  *See* 29 U.S.C. § 1399(c)(1)(D)(i).

amounts. 29 C.F.R. § 4219.15(b).[6] The amount of the plan's unfunded vested benefits is

reallocated among the liable employers in accordance with 29 C.F.R. § 4219.15(c), which in

essence reallocates to an employer its pro-rated share of liability "that the Fund has determined is

unrecoverable from other employers." *UFCW Loc. 174 Pension Fund v. Int'l Glatt Kosher Meat

Processing Corp.*, No. 17-CV-5790, 2018 WL 3742731, at *3 n.5 (E.D.N.Y. May 15, 2018),

*report and recommendation adopted*, 2018 WL 3435059 (E.D.N.Y. July 13, 2018); *see* 29

C.F.R. § 4219.15(c)(2) (requiring plan, "after computing each employer's initial allocable share

of unfunded vested benefits," to "allocate any . . . unassessable amounts among all other liable

employers").[7]

Part 2 of Subtitle E of ERISA, 29 U.S.C. §§ 1411-1415, governs "merger or transfer of

plan assets or liabilities." *See Mar-Can*, 722 F. Supp. 3d at 366-67. When "an employer has

completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change

of collective bargaining representative" and "participants of the old plan who are employed by

the employer will, as a result of that change, participate in another multiemployer plan,"

---

[6] The "mass withdrawal valuation date" means either "(1) [i]n the case of a termination by mass withdrawal, the last day of the plan year in which the plan terminates" or "(2) [i]n the case of a withdrawal of substantially all employers pursuant to an agreement or arrangement to withdraw, the last day of the plan year as of which substantially all employers have withdrawn." 29 C.F.R. § 4219.2(b).

[7] Mass withdrawal liability determinations are subject to mandatory arbitration. 29 C.F.R. § 4219.16(g); *see* 29 U.S.C. § 1401(a)(1) (requiring employer to initiate arbitration within sixty days if it wishes to dispute a plan's determination regarding withdrawal and reallocation liability). If an employer fails to initiate arbitration within the time required by statute, the plan's determination as to the fact and amount of initial withdrawal liability and mass withdrawal liability becomes final, must be paid according to the schedule established by the plan, *see* 29 U.S.C. § 1401(b), and is not subject to judicial review except in very narrow circumstances, *see Trs. of the Loc. 813 Pension Tr. Fund v. Frank Miceli Jr. Contracting, Inc.*, No. 13-CV-198, 2016 WL 5879612, at *2 (E.D.N.Y. Mar. 9, 2016), *report and recommendation adopted*, 2016 WL 1275041 (E.D.N.Y. Mar. 31, 2016).

§ 1415(a) mandates that the old plan transfer liabilities and assets to the new plan "in accordance with [§ 1415]."  29 U.S.C. § 1415(a); *see T.I.M.E.-DC*, 756 F.2d at 944; *Mar-Can*, 722 F. Supp. 3d at 367; *Hoeffner*, 2016 WL 8711082, at *6.  Section 1415 "requires that notice be given and sets forth procedures for transferring assets and liabilities from the old to the new plan." *T.I.M.E.-DC*, 756 F.2d at 944; *see* 29 U.S.C. §§ 1415(b), (g).  "Upon completion of a transfer of the appropriate amount of assets and liabilities, Section 1415(c) requires a reduction of the employer's withdrawal liability with respect to the old plan."  *Mar-Can*, 722 F. Supp. 3d at 367. Section 1415(c) reads as follows:

> **(c) Reduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan**
>
> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which–
> > (1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds
> > (2) the value of the assets transferred.

29 U.S.C. § 1415(c).  Section 1415(g)(1) provides the formula to determine the "appropriate amount of assets" as follows:

> **(g) Definitions**
>
> For purposes of this section –
> > (1) "appropriate amount of assets" means the amount by which the value of the nonforfeitable benefits to be transferred exceeds the amount of the employer's withdrawal liability to the old plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title) . . . .

29 U.S.C. § 1415(g)(1).

"Section 1415(c) is a relief provision provided for employers who have withdrawn because of certified changes in collective bargaining representatives, or put another way, for actions taken not by the employers but by their employees." *Mar-Can*, 722 F. Supp. 3d at 376 (citing Pension Benefit Guar. Corp., Opinion Letter 86-7 (Mar. 24, 1986), 1986 WL 38785, at *1 ("Op. Ltr. 86-7")). "That relief is that to the extent the old plan transfers unfunded liabilities for which the employer will be responsible to the new plan, its withdrawal liability to the old plan is reduced," *id.* at 377 (citing Op. Ltr. 86-7 at *1), and going forward the employer makes contributions to the new plan that will be carrying the unfunded liabilities, *id.*

### B.    Interpreting § 1415(g)(1)

In *Mar-Can*, I interpreted § 1415 and the surrounding statutory framework, determining how a plan sponsor must apply the § 1415(c) reduction to a withdrawing employer's withdrawal liability with respect to an old plan in connection with a § 1415 transfer. 722 F. Supp. 3d at 365-77. I concluded that, for purposes of § 1415(c), "unfunded vested benefits allocable to the employer" means the total amount of unfunded liabilities transferred, *see id.* at 370-73, and as a result, "under Section 1415(c), to determine the reduction to an employer's withdrawal liability to the old plan, the value of the transferred assets is subtracted from the value of the total transferred liabilities," *id.* at 372. Thus, *Mar-Can* decided the question of how to interpret and apply § 1415(c). While I mentioned the § 1415(g)(1) formula while interpreting § 1415(c), the question of how to interpret § 1415(g)(1) was not before me. It is now.[8]

---

[8] The parties agree that § 1415, which governs a withdrawal based on a certified change in collective bargaining representative, applies here, even though North Star's withdrawal was triggered by the Old Union's disclaimer on November 2, 2020, rather than by the August 25, 2021 certification of North Star's employees' election to join the ATW Fund. I will assume the same.

North Star and the Old Plan dispute the meaning of § 1415(g)(1)'s language and its application in this case. Specifically, the parties ask me to interpret the phrase "the employer's withdrawal liability to the old plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title)." 29 U.S.C. § 1415(g)(1). North Star argues that the phrase includes not just the employer's initial withdrawal liability but also both redetermination and reallocation liability imposed following a mass withdrawal. (*See* P's Mem. at 6-8; P's Reply at 2-4.) The Old Plan contends that the phrase refers only to the employer's initial withdrawal liability determined by § 1381(b). (*See* D's Opp. at 4-6.)

"[S]tatutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015); *see Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022) (court's "analysis begins, as it must, with the plain text of [the statute]"). "[I]f [the] statutory language is plain, [the court] must enforce it according to its terms." *Am. C.L. Union v. Clapper*, 804 F.3d 617, 623 (2d Cir. 2015). "To identify a statute's plain meaning, [courts] afford words their ordinary, common-sense meaning and draw on the specific context in which that language is used." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023). Courts read the statute as a whole, rather than "constru[ing] statutory phrases in isolation." *Springfield Hosp.*, 28 F.4th at 418; *see Am. C.L. Union*, 804 F.3d at 623 ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme."); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 368 (2d Cir. 2006) (court's "first task is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case").

In short, "[w]hether a statute is plain or ambiguous 'is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Frank G.*, 459 F.3d at 368 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "[L]anguage is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person . . . ." *Id.* "If the statutory language is unambiguous and the statutory scheme is coherent and consistent," then judicial inquiry "must cease." *Robinson*, 519 U.S. at 340; *see Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."). But if the "meaning is not clear, [courts] make use of a variety of interpretive tools, including canons, statutory structure, and legislative history." *Spadaro v. U.S. Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020). "[Courts] must construct an interpretation that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, No. 20-CV-9894, 2021 WL 2350094, at *16 (S.D.N.Y. June 8, 2021).

### 1.    Ambiguity

Section 1415(g)(1) refers to "employer's withdrawal liability to the old plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title)." 29 U.S.C. § 1415(g)(1). Neither that subsection nor any other portion of § 1415 specifies whether "employer's withdrawal liability" refers only to initial withdrawal liability or includes mass (redetermination and reallocation) withdrawal liability. North Star contends that "employer's withdrawal liability" means the "full value of withdrawal liability" calculated under all sections of Part 1 of Subtitle E, including the redetermination and reallocation withdrawal liability

assessed in a mass withdrawal under § 1399(c)(1)(D). (P's Mem. at 8.) At first blush, North Star's argument appears supported by § 1415(g)(1)'s language – it only excludes § 1391(e) and arguably calls for inclusion of mass withdrawal liability as calculated under § 1399. But peering past § 1415(g)(1) in isolation and considering the context of that subsection and § 1415 as a coherent whole, North Star's reading of the language is less convincing.

At the threshold, § 1399 directs a plan to assess an employer's redetermination and reallocation liability only in the event of a mass withdrawal. *See* § 1399(c)(1)(D). But § 1415 does not contain any reference to a mass withdrawal; rather, that section, entitled "Transfer pursuant to change in bargaining representative," applies when "an employer has completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change of collective bargaining representative" and "participants of the old plan who are employed by the employer will, as a result of that change, participate in another multiemployer plan." 29 U.S.C. § 1415(a); *see T.I.M.E.-DC*, 756 F.2d at 944; *Mar-Can*, 722 F. Supp. 3d at 367; *Hoeffner*, 2016 WL 8711082, at *6. Under those conditions, § 1415 mandates transferring liabilities and assets from the old plan to the new plan in accordance with that section. *See T.I.M.E.-DC*, 756 F.2d at 944; *Mar-Can*, 722 F. Supp. 3d at 367. The transfer obligation under § 1415(a) is triggered when the employer signs a collective bargaining agreement with the new plan and thus both becomes obligated to contribute to the new plan and can reasonably ascertain which employees would be eligible to participate. *See T.I.M.E.-DC*, 756 F.2d at 948; *Hoeffner*, 2016 WL 8711082, at *6-7. It has nothing to do with mass withdrawal.

As part of the § 1415(a) obligation, the old plan must determine the amount of liabilities[9] to be transferred, *see* 29 U.S.C. § 1415(b)(2), and only the liabilities of active employees participating in the new plan should be transferred under § 1415, *see T.I.M.E.-DC*, 756 F.2d at 945-46 ("The goal of the withdrawal and transfer provisions of the MPPAA is to ensure that the employer covers its pension obligations in both the old and the new plans.  When an employee is transferred from an old unit to a new unit, responsibility for paying pension benefits follows the employee."); *Hoeffner*, 2016 WL 8711082, at *8 (sections 1415(g)(1) and (b)(2)(A)(ii) must be read together to determine the liabilities to be transferred); Pension Benefit Guar. Corp., Opinion Letter 88-6 (Apr. 1, 1988), 1988 WL 192427, at *1 ("Op. Ltr. 88-6") ("[I]t is the opinion of the PBGC that section [1415] contemplates the transfer of benefit liabilities only for participants who are active employees.").  The liabilities to be transferred are valued at the time that the § 1415(a) obligation is triggered, and the employer's withdrawal liability is "always determined under Part 1 of Subtitle E, namely 29 U.S.C. §§ 1381(b) and 1391, at the time of an employer's withdrawal from the old plan."  *Hoeffner*, 2016 WL 8711082, at *7-8 (discussing § 1415(g)(1)); *see Walter v. Int'l Ass'n of Machinists Pension Fund*, 949 F.2d 310, 314 & n.8 (10th Cir. 1991) (regarding § 1415(g)(1) calculation, "[a]n employer's withdrawal liability is basically a liability that arises when the employer stops contributing to a plan").

Thus, viewed in the overarching context of § 1415, the § 1415(g)(1) calculation involving both the value of the liabilities to be transferred and the employer's withdrawal liability to the old plan is tied to the time the § 1415(a) transfer is triggered.  It follows that § 1415 "looks only to the liabilities and assets that will be transferred regarding a specific employer without

_____

[9] As the Court previously noted in *Mar-Can*, it is appropriate to use the terms "nonforfeitable benefits," "vested benefits," and "liabilities" interchangeably for the purposes of this Opinion.  *See Mar-Can*, 722 F. Supp. 3d at 371 n.14.

reference to the total plan's assets and liabilities," *Mar-Can*, 722 F. Supp. 3d at 369, and thus the statute's framework does not appear concerned with a mass withdrawal. Indeed, the PBGC's regulations specify that reallocation liability is based on the *plan*'s total unfunded vested benefits "determined as of the mass withdrawal valuation date" – not the liabilities to be transferred under § 1415 that are associated with a specific *employer* and valued upon that employer's withdrawal and obligation to a new plan. *Compare* 29 C.F.R. § 4219.15(b), *and* 29 C.F.R. § 4219.2(b), *with Hoeffner*, 2016 WL 8711082, at *8. Moreover, while redetermination liability removes the *de minimis* and 20-year-limitation protections from an employer's initial withdrawal liability, this removal results from a mass withdrawal and not a § 1415 transfer. *See* Pension Benefit Guar. Corp., Opinion Letter 88-5 (Apr. 1, 1988), 1988 WL 192431, at *1 ("Op. Ltr. 88-5") (mass withdrawal requires "that certain withdrawn employers lose the benefit of the *de minimis* reduction that would otherwise apply" and "requires that the liabilities of withdrawn employers be determined without regard to the 20-year limitation on annual payments"); *see also* Pension Benefit Guar. Corp., Opinion Letter 87-12 (Oct. 27, 1987), 1987 WL 68413, at *2 ("Op. Ltr. 87-12") (following a transfer of liabilities to new plan, a withdrawing employer "may become liable to the multiemployer plan for additional amounts (over and above its initial withdrawal liability)" if part of a mass withdrawal).

Thus, I do not see why an employer's redetermination and reallocation liabilities should be incorporated into § 1415(g)(1)'s language when § 1415 operates outside the context of a mass withdrawal. At the very least, both parties present two different reasonable interpretations of § 1415(g)(1), which suggests that the language is not entirely clear. *See Frank G.*, 459 F.3d at 368. And, as discussed below, North Star's interpretation does not result in a "coherent and consistent" statutory scheme. *Robinson*, 519 U.S. at 340. Thus, I find that the plain language of

§ 1415(g)(1) is ambiguous: "the employer's withdrawal liability to the old plan" could mean the liability based on the employer's withdrawal, or it could mean the liability based on the employer's withdrawal plus the liability imposed on it in the event of a mass withdrawal. In that event, as noted, the employer essentially returns to the old plan its savings from the *de minimis* rule and the twenty-year amortization cap, which do not apply if there is a mass withdrawal, and also is responsible for a pro-rated share of liabilities attributable to other employers but which are unassessable. As these categories alter the calculation of "the employer's withdrawal liability to the old plan," and include liabilities resulting from circumstances beyond the control of the employer or its employees, it is not plain to me that they are included within that phrase.

## 2.    Interpretation

I conclude, as the Old Plan contends, that § 1415(g)(1) refers only to the employer's withdrawal liability defined in § 1381(b) without regard to a mass withdrawal. This liability is otherwise known as "initial withdrawal liability."[10] I base this conclusion on several reasons set forth below.

As previewed above, the overarching framework of § 1415 supports this interpretation. *See Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) ("Where the plain text does not conclusively resolve the question, [courts] can draw upon a variety of interpretive tools, including statutory structure, to discern the text's meaning and purpose."). Section 1415(b) first mentions "employer's withdrawal liability" with respect to the obligations of the old plan after receiving notice of the withdrawal set forth in § 1415(a) as follows:

---

[10] The PBGC's regulations define "initial withdrawal liability, for the purposes of Part 4219 of Subchapter I of the Code of Federal Regulations, as "the amount of withdrawal liability determined . . . without regard to the occurrence of a mass withdrawal." 29 C.F.R. § 4219.2(b).

**(b) Notification by employer of plan sponsor of old plan; notification by plan sponsor of old plan of employer and plan sponsor of new plan; appeal by new plan to prevent transfer; further proceedings**

\*\*\*

(2) The plan sponsor of the old plan shall –
    (A) notify the employer of –
        (i) the amount of the *employer's withdrawal liability* determined under part 1 of this subtitle *with respect to the withdrawal*[.]

29 U.S.C. § 1415(b)(2)(A)(i) (emphasis added).  Section 1415(e)(2)'s relief provision uses near identical language.  That statute states in relevant part:

**(e) Prohibition on transfer of assets to new plan by plan sponsor of old plan; exemptions**

\*\*\*

(2) In any case in which a transfer of assets from the old plan to the new plan is prohibited by paragraph (1), the plan sponsor of the old plan shall transfer –
    (A) all nonforfeitable benefits described in subsection (b)(2), if the value of such benefits does not exceed the *withdrawal liability of the employer with respect to such withdrawal*[.]

29 U.S.C. § 1415(e)(2)(A) (emphasis added).  An employer's withdrawal liability is "an amount representing the share of the old plan's unfunded vested benefits attributable to a withdrawing employer's participation, to be assessed on the withdrawing employer by the old plan at the time of the withdrawal."  *Hoeffner*, 2016 WL 8711082, at \*3; *see T.I.M.E.-DC*, 756 F.2d at 946 ("The term withdrawal liability simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the employees upon their retirement.").  In both § 1415(b)(2)(A)(i) and § 1415(e)(2)(A), the phrase "with respect to the [or such] withdrawal" must refer to the withdrawal of the employer because of a certified change of collective bargaining representative

as set forth in § 1415(a), which is the only withdrawal referenced within § 1415.  The phrase thus

does not include mass withdrawal liability.

Section 1415(c)'s reduction lends additional support.  That statute states, in relevant part,

that following a § 1415 transfer of the appropriate amount of assets and liabilities,

> the amount of the employer's withdrawal liability (as determined under section
> 1381(b) of this title without regard to such transfer and this section) with respect
> to the old plan shall be reduced by the amount by which – (1) the value of the
> unfunded vested benefits allocable to the employer which were transferred by the
> plan sponsor of the old plan to the new plan, exceeds (2) the value of the assets
> transferred.

29 U.S.C. § 1415(c).  First, the phrases "under section 1381(b)" and "under part 1 of this

subtitle" mean the same thing in the context of § 1415.  *See Hoeffner*, 2016 WL 8711082, at *10

n.18 ("As the Court previously noted, Section 1381(b) is simply the general provision in Part 1

establishing that withdrawal liability should be calculated under Part 1.  Thus, 'under section

1381(b)' means the same as 'under Part 1.'"); *see also* 29 C.F.R. § 4219.11(a) (initial withdrawal

liability is determined "pursuant to section [1381] of ERISA").

Second, the reduction in an employer's withdrawal liability is directly connected to the

transfer of the appropriate amount of assets and liabilities between the old and new plans under

§ 1415.  Again, this transfer of assets and liabilities is triggered by the withdrawal of an

employer pursuant to a certified change of collective bargaining representative, *see* § 1415(a),

not a mass withdrawal.  Indeed, the PBGC's regulations themselves recognize that initial

withdrawal liability – as defined and determined by § 1381(b) or, put another way, under part 1

of subtitle E – is independent of a mass withdrawal.  *See* 29 C.F.R. § 4219.2(b); *id.* § 4219.11(a);

*5600 Mkt. Corp.*, 2018 WL 4403394, at *6.  Because the § 1415(a) withdrawal is the only one

mentioned in the statute and is a prerequisite for the transfer of assets and liabilities, it follows

that the reference to "the employer's withdrawal liability" in both §§ 1415(c) and 1415(g)(1)

must refer to the employer's withdrawal liability amount calculated under § 1381(b) at the time

of the employer's withdrawal from the old plan.  *See Mar-Can Transp. Co. v. Loc. 854 Pension*

*Fund*, No. 20-CV-8743, 2024 WL 3887191, at *8 (S.D.N.Y. Aug. 21, 2024) ("[T]he amount of

an employer's withdrawal liability to the old plan is a necessary variable in the calculation of

both the 'appropriate amount of assets' to transfer under § 1415(g) and the § 1415(c)

reduction.").

       Using the amount of the employer's initial withdrawal liability in the respective

calculations of the "appropriate amount of assets" to transfer under § 1415(g) and the reduction

under § 1415(c), *see id.*, makes sense considering, for example, situations in which an employer

or the new plan disputes the amount of assets and liabilities to transfer under § 1415 in the

context of ERISA's "pay now, dispute later" procedures.  I held in *Mar-Can* that such a dispute

effectively challenges the amount of the withdrawal liability associated with that transfer.  *See id.*

And I emphasized "that the interplay between § 1415 and § 1399 does not alter Congress's aim

to require an employer to begin paying withdrawal liability in accordance with a § 1399(b)(1)(B)

demand."  *Id.*  Put another way, "'the fact that the new plan or employer disputes the amount that

the old plan proposes to transfer [under § 1415] does not relieve the employer of its obligation to

pay the withdrawal liability according to the payment schedule set by the sponsors of the old

plan.'"  *Id.* (quoting *T.I.M.E.-DC*, 756 F.2d at 947).  The employer's withdrawal liability

discussed in *T.I.M.E.-DC* must therefore refer to the withdrawal liability associated with the

liabilities to be transferred under § 1415 – that is, the initial withdrawal liability.  In fact, "to

execute the transfer, there must be a determined amount of withdrawal liability to calculate the

appropriate amount of assets under § 1415(g), and once the transfer occurs, to calculate and

apply the § 1415(c) reduction to *that withdrawal liability*."  *Mar-Can*, 2024 WL 3887191, at *9

(emphasis added).  It cannot be that executing the § 1415 transfer – which is triggered when the conditions of § 1415(a) are met – would be dependent on the possibility of a mass withdrawal occurring in the future, if at all.[11]

North Star discusses two hypothetical transfers to highlight why it believes that § 1415(c) only works as intended under its interpretation of § 1415(g)(1).  (*See* P's Mem. at 6-7.)  But both examples conflate the liabilities involved in a § 1415 transfer and the liabilities involved in a mass withdrawal, ignoring that § 1415 only transfers the liabilities associated with active employees who will participate in the new plan.  *See T.I.M.E.-DC*, 756 F.2d at 946; *Mar-Can*, 722 F. Supp. 3d at 372-73, 77; *Hoeffner*, 2016 WL 8711082, at *8; *see also* Op. Ltr. 86-7 (relief provided under § 1415(c) is limited to the extent that the old plan transfers unfunded liabilities to the new plan), whereas mass withdrawal liability includes payments on account of inactive employees who remain with the old plan as well as liabilities associated with other employers.  While North Star expresses concern that the Old Plan's interpretation "effectively defeats the statutory withdrawal liability offset in Section 1415(c)" because North Star "would continue to double-pay by making contributions to the New Plan, while making withdrawal liability

---

[11] The relevant dates here highlight the tension created by North Star's interpretation. According to the parties, the § 1415(a) obligation was triggered on August 25, 2021, (*see* D's Resp. ¶ 16), and the Old Plan assessed (and demanded payment of) North Star's withdrawal liability in connection with its complete withdrawal on September 9, 2021, (*id.* ¶ 21; ECF No. 26-9).  On January 6, 2022, the Old Plan advised the PBGC that it had experienced a mass withdrawal of substantially all contributing employers as of the plan year ending August 31, 2021, (D's Resp. ¶ 24) – nearly five months after the § 1415(a) transfer obligation was triggered. Under North Star's interpretation, the § 1415 transfer either could not have been executed until the Old Plan was certain that it would not have experienced a mass withdrawal in that plan year (or waited until it did), or the transfer would have to be re-executed upon the occurrence of a mass withdrawal.  Neither option finds support in § 1415's language, purpose, or operation, and indeed would undermine the "pay now/dispute later" provision of ERISA.  Thus, it cannot be that § 1415(g)(1) includes an employer's reallocation and redetermination liability, when those obligations come into existence, if at all, beyond the time when the obligations of § 1415 are triggered.

payments to the Old Plan for pension liabilities the Old Plan has already transferred and no longer has any obligation to pay," (P's Mem. at 7), that concern is misplaced.  First, North Star would not be paying the Old Plan for liabilities transferred under § 1415:  "once the old plan transfers the unfunded liabilities off its books to a new plan, the old plan is no longer responsible for the benefits of the departing active employees and the employer's obligation to the old plan for those transferred liabilities ceases."  *Mar-Can*, 722 F. Supp. 3d at 372-73 (citing Op. Ltr. 86-7 at *1); *see id.* at 377 ("In other words, to avoid double payments and keep both plans funded, Section 1415 requires that after the transfer, the employer pays the plan that will be carrying the unfunded liabilities.").  Second, North Star's withdrawal liability to the Old Plan with respect to the transferred liabilities would be reduced under § 1415(c).  *See id.* at 372-73, 376-77.  Thus, under the Old Plan's interpretation and contrary to North Star's position, § 1415(c)'s reduction operates both as intended and as required by the statute itself.  *See T.I.M.E.-DC*, 756 F.2d at 946 ("[Section 1415] further requires the old plan reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees.  In this way the statute reaches a proper allocation of the employer's payments on behalf of its employees.  It ensures that both plans are funded and avoids the possibility of double payments by the employer.").  And as discussed earlier, (*see supra* pages 15-18), § 1415(g)(1)'s language confirms this interpretation:  it looks to the employer's withdrawal liability associated with liabilities transferred under § 1415.  *See T.I.M.E.-DC*, 756 F.2d at 946; *Mar-Can*, 722 F. Supp. 3d at 369-71; *Hoeffner*, 2016 WL 8711082, at *8.  Thus, under § 1415's framework, it does not follow that § 1415(g)(1) would incorporate liabilities – that is, mass withdrawal liability (*i.e.*, redetermination and reallocation liabilities) – beyond the § 1415 transfer.

North Star argues that the canon of statutory construction *expressio unius est exclusio alterius* shows that § 1415(g)(1) includes the mass withdrawal liability provisions in its calculation.  (*See* P's Mem. at 8, 12.)  Specifically, North Star contends that § 1415(g)(1)'s express exclusion of § 1391(e) supports that Congress intended to include § 1399 and its accompanying redetermination and reallocation withdrawal liability assessments.  (*See id.*)  "As a matter of statutory construction, [the Court] presume[s] that the legislature follows the principle of *expressio unius est exclusio alterius* – that is, mention of one impliedly excludes others."  *Brennan-Centrella v. Ritz-Craft Corp. of Pa.*, 942 F.3d 106, 111 (2d Cir. 2019).  But that canon is "only an aid to statutory construction, not a rule of law, making the principle an uncertain guide to interpretation."  *Id.*  Use of *expressio unius* depends on context, and it "applies only when it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it, that is, when circumstances support a sensible inference that the term left out must have been meant to be excluded."  *Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020) ("Virtually all the authorities who discuss *expressio unius* emphasize that it must be applied with great caution, since its application depends so much on context.").

Based on the context of § 1391(e), § 1399(c)(1)(D), and the § 1415 framework, I disagree with North Star's *expressio unius* argument.  As the Old Plan argues, (*see* D's Opp. at 6-7), § 1391(e) and § 1399(c)(1)(D) serve different functions.  In *T.I.M.E.-DC*, the Second Circuit briefly noted the differences between those statutes, referring to § 1391 as part of the "method for computing withdrawal liability," while § 1399 establishes "rules for both the notice requirements and collection of the payment" for withdrawal liability.  756 F.2d at 944.  Section § 1391(e) applies where an employer voluntarily ceases contributing and the old plan chooses to transfer liabilities to the new plan (unlike the § 1415 situation, where the cessation is the result of

a certified employee change in bargaining representative and the transfer of assets and liabilities is mandatory).  *See Mar-Can*, 722 F. Supp. 3d at 372 ("Both Sections 1391(e) and 1415(c) reduce an employer's withdrawal liability in connection with a transfer between plans:  the former where a plan transfers liabilities incidental to an employer's withdrawal, and the latter where a plan must transfer both assets and liabilities because the collective bargaining representative changed."); Op. Ltr. 87-12 at *1 ("[Section 1391(e)] reflects the fact that a transfer of vested benefit liabilities (to the extent not offset by a transfer of assets) reduces a plan's unfunded vested benefits much the same as a payment of withdrawal liability.").  It provides for a reduction in an employer's withdrawal liability when an old plan transfers liabilities to a new plan.  *See Mar-Can*, 722 F. Supp. 3d at 366, 371-72; 29 U.S.C. § 1391(e).  Section 1399(c)(1)(D) does not involve a transfer of liabilities between plans, and it applies only "[i]n any case in which a multiemployer plan terminates by the withdrawal of every employer from the plan, or in which substantially all the employers withdraw from a plan pursuant to an agreement or arrangement to withdraw from the plan."  29 U.S.C. § 1399(c)(1)(D).  It further directs that in the event of such a mass withdrawal, redetermination and reallocation liability must be assessed with respect to the withdrawing employers.  *See id.* §§ 1399(c)(1)(D)(i),(ii).  Notably, it does not contain any reduction to withdrawal liability like § 1391(e).

Given the differences between §§ 1391(e) and 1399(c)(1)(D) in the context of a § 1415 transfer, Congress's exclusion of § 1391(e) from § 1415(g)(1) does not imply § 1399(c)(1)(D)'s inclusion in the § 1415(g)(1) calculation.  When a § 1415 transfer of liabilities and assets occurs, it makes sense to exclude the § 1391(e) reduction from § 1415(g)(1)'s formula because § 1391(e) would have already reduced the employer's withdrawal liability – a variable in the § 1415(g)(1) calculation – by the amount of transferred liabilities.  *See* 29 U.S.C. § 1391(e) ("In the case of a

transfer of liabilities to another plan incident to an employer's withdrawal or partial withdrawal, the withdrawn employer's liability under this part shall be reduced in an amount equal to the value, as of the end of the last plan year ending on or before the date of the withdrawal, of the transferred unfunded vested benefits."); *Mar-Can*, 722 F. Supp. 3d at 366, 70-72 (explaining, among other things, the § 1391(e) reduction. If the § 1391(e) reduction were not carved out of the § 1415(g)(1) calculation, the liabilities to be transferred would in a sense be counted twice, in that § 1391(e) would require the withdrawal liability to be reduced by the value of the transferred liabilities as of the end of plan year ending on or before that withdrawal, but then 1415(g)(1)'s calculation of the appropriate amount of assets to transfer – which requires withdrawal liability to be subtracted from the value of the transferred liabilities as of the time the employees begin participating in a new plan resulting from the certified change of bargaining representative – would be using as withdrawal liability the figure as already reduced under § 1391(e).[12]  This would result in a lopsided outcome in which the old plan would be transferring liabilities as well as an amount of assets close (if not identical) to the value of those liabilities, while the employer would receive a smaller § 1415(c) reduction to its withdrawal liability to the old plan even though it was leaving behind at the old plan no (or almost no) unfunded liabilities associated

---

[12] The "appropriate amount of assets" to be transferred as calculated by § 1415(g)(1) is the value of the liabilities to be transferred (as of the time the employees begin participating in the new plan) minus withdrawal liability.  Let us phrase that as the mathematical formula A minus B.  Let us further assume, for simplicity's sake, that the value of the liabilities to be transferred is roughly the same at both the time the active employees begin participating in the new plan and at the end of the plan year ending on or before the withdrawal.  If "withdrawal liability" for purposes of the formula – that is, the value of B – did not exclude § 1391(e)'s reduction, B would mean "withdrawal liability as calculated under § 1391(e)."  Because withdrawal liability as calculated under § 1391(e) is "withdrawal liability minus value of liabilities to be transferred," B would equal B minus A.  The § 1415(g)(1) calculation would become A minus (B minus A).  B minus A would usually be zero, meaning the appropriate amount of assets to be transferred would be roughly the same as the value of the liabilities to be transferred.

with the transferred employees.[13]  Including the § 1391(e) reduction in § 1415(g)(1) would result in the employer paying withdrawal liability to the old plan for liabilities that it no longer carries – a result that the Court rejected in *Mar-Can*.  *See* 722 F. Supp. 3d at 372-77.  In other words, and to avoid these results, "the phrase 'without regard to section 1391(e)' means simply that the withdrawal liability amount to use for purposes of the Section 1415(g)(1) formula should be the normal amount of withdrawal liability that is calculated under Section 1391 and *not* reduced by the amount of unfunded vested benefits to be transferred, as contemplated in Section 1391(e)." *Hoeffner*, 2016 WL 8711082, at *8 (emphasis in original).

But this concern does not apply to § 1399(c)(1)(D), which does not contain any reduction to an employer's withdrawal liability, does not involve a transfer of liabilities or assets, and is not otherwise implicated in a § 1415 transfer.  Thus, § 1415(g)(1)'s silence about § 1399(c)(1)(D) does not support North Star's interpretation.  *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (*expressio unius* "has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence").  Congress simply had no need or reason to carve out any provisions other than § 1391(e).

North Star additionally contends that because § 1399(c)(1)(D)(ii) – which describes reallocation liability – begins with a clause stating, "notwithstanding any other provision of this part," it modifies § 1391, and because § 1381(b) incorporates § 1391, § 1399(c)(1)(D)(ii) must be incorporated into § 1381(b).  (*See* P's Mem. at 11-12.)  Therefore, North Star maintains, mass

---

[13] Conversely, with the § 1391(e) reduction carved out, fewer assets would be transferred; the old plan would therefore rid itself of more liabilities than assets; and the employer's § 1415(c) reduction would be increased proportionately, leaving the employer with an increased ability to make contributions to the new plan.

withdrawal liability is incorporated into § 1381(b)'s calculation of withdrawal liability, and in turn incorporated into § 1415(g)(1).  (*See id.*)   This argument is misplaced.  Section 1399(c)(1)(D)(ii) reads:  "notwithstanding any other provision of this part, the total unfunded vested benefits of the plan shall be fully allocated among all such employers in a manner not inconsistent with regulations which shall be prescribed by the [PBGC]."  To be sure, North Star is correct that the subsection contains a "notwithstanding clause."  But its argument that that clause means that § 1399(c)(1)(D)(ii) is "included within and intrinsic to the Section 1381(b) definition," (P's Mem. at 12), paints only half the picture.  It does not address the preliminary language that triggers the clause, found in § 1399(c)(1)(D), which states, "In any case in which a multiemployer plan terminates by the withdrawal of every employer from the plan, or in which substantially all the employers withdraw from a plan pursuant to an agreement or arrangement to withdraw from the plan . . . ."  Thus, the "notwithstanding clause" only applies in the event of a mass withdrawal – a situation distinct from when an employer withdraws from a multiemployer plan under § 1415(a).  Indeed, neither 29 U.S.C. §§ 1381 nor 1391 refers to either a mass withdrawal or to § 1399(c)(1)(D).  While § 1399(c)(1)(D) may alter the § 1391 calculation in the event of a mass withdrawal, North Star does not provide authority suggesting that § 1415 encompasses mass withdrawal liability.  Thus, I do not find North Star's argument to be persuasive.

Finally, North Star's interpretation of § 1415(g)(1) would lead to anomalous results. When analyzing an ambiguous statute, it should be interpreted to avoid absurd, anomalous, or unreasonable results.  *See Frank G.*, 459 F.3d at 368; *Bakery & Confectionery Union*, 2021 WL 2350094, at *16.  As the Old Plan highlights, (D's Opp. at 7-13), North Star's proposed interpretation would give an unintended benefit to the employer at the expense of the new plan,

by giving the employer credit in the § 1415(c) reduction for liabilities – the redetermination and reallocation liabilities – that have not been transferred to the new plan:  the employer would receive a higher reduction to its withdrawal liability owed to the old plan based on liabilities that are not transferred under § 1415, and the new plan would be short assets that would have been transferred to cover at least some amount (in most cases) of the actual transferred liabilities.  Moreover, the old plan appears to benefit under North Star's interpretation because it would seemingly result in zero-asset transfers, thereby permitting the old plan to retain assets that would otherwise be transferred under § 1415 to cover the transferred liabilities associated with active employees now participating in the new plan.  (*See* D's Opp. at 10 n.3.)

To illustrate the problem with North Star's interpretation, I turn to the amounts at issue on this motion, rounded for simplicity's sake.  On or about September 9, 2021, the Old Plan assessed initial withdrawal liability against North Star totaling $40,000.[14]  (*See* D's Resp. ¶¶ 21-22.)  After notifying the PBGC in January 2022 that the Old Plan experienced a mass withdrawal, (*id.* ¶ 24), the Old Plan assessed redetermination withdrawal liability against North Star totaling $50,000, (*id.* ¶ 25), and assessed reallocation withdrawal liability totaling $249,000, (*id.* ¶ 26).  The Old Plan has proposed transferring $110,000 in liabilities to the New Plan.  (*See* ECF No. 26-17 at 1; P's Mem. at 6 n.1; D's Opp. at 3.)   Under North Star's theory, the § 1415(g)(1) calculation would be as follows:  the "appropriate amount of assets" to be transferred from the Old Plan to the New Plan would equal $110,000 (value of nonforfeitable benefits, *i.e.*, liabilities, to be transferred to the New Plan) minus $339,000 (total amount of North Star's initial, redetermination, and reallocation liabilities to the Old Plan).  Under that

---

[14] As the parties are currently arbitrating whether these amounts are correct, (*see* P's Mem. at 7 n.2; D's Opp. at 16), the Court does not opine on the accuracy of these amounts but refers to them only for illustrative purposes.

calculation, the "appropriate amount of assets" to transfer to the New Plan would be negative $229,000, which would become $0, and thus the Old Plan would transfer no assets to the New Plan. Turning to the § 1415(c) reduction, the value of the assets transferred – $0 – would be subtracted from the value of the total transferred liabilities – $110,000 – resulting in a $110,000 offset to North Star's combined withdrawal liability to the Old Plan.[15] Thus, the Old Plan would transfer $110,000 in liabilities and $0 in assets to the New Plan, and North Star's combined initial, redetermination, and reallocation liabilities to the Old Plan would be reduced from $339,00 to $229,000. In this scenario, the Old Plan has transferred liabilities yet retained its assets, whereas the New Plan has taken on $110,000 in new liabilities but has received no new assets to offset them, and North Star has received a § 1415(c) reduction of $110,000 to its total withdrawal liability to the Old Plan, which is predominantly composed of North Star's redetermination and reallocation liabilities.

Under the Old Plan's interpretation, the § 1415 transfer would occur as follows: the "appropriate amount of assets" under § 1415(g)(1) would equal $110,000 (value of nonforfeitable benefits, *i.e.*, liabilities, to be transferred to the New Plan) minus $40,000 (North Star's initial withdrawal liability determined at the time of its withdrawal from the Old Plan) – meaning $70,000 in assets would go to the New Plan. Turning to the § 1415(c) reduction, the value of the assets transferred – $70,000 – would be subtracted from the value of the total transferred liabilities – $110,000 – resulting in a $40,000 offset to North Star's initial withdrawal liability to the Old Plan with respect to the transferred liabilities (and reducing that initial

---

[15] These examples use the § 1415(c) reduction formula that the Court found in *Mar-Can* to be appropriate. *See* 722 F. Supp. 3d at 372 ("[U]nder Section 1415(c), to determine the reduction to an employer's withdrawal liability to the old plan, the value of the transferred assets is subtracted from the value of the total transferred liabilities.").

withdrawal liability to zero).  Thus, the Old Plan would transfer $110,000 in liabilities and $70,000 in assets to the New Plan, and North Star's combined liability to the Old Plan would be $299,000 ($50,000 in redetermination liability and $249,000 in reallocation liability) after its initial withdrawal liability is reduced by $40,000 under § 1415(c).  In other words, the Old Plan transfers assets in connection with the transferred liabilities, the New Plan would receive $110,000 in new liabilities and $70,000 in new assets to offset them, and North Star receives relief limited to its withdrawal liability associated with the liabilities that the Old Plan transferred.

Under North Star's interpretation, the Old Plan receives an effective windfall:  it wipes $110,000 in liabilities off its books while retaining $70,000 in assets that it otherwise would have had to transfer to the New Plan.  Meanwhile, the New Plan suffers:  it receives net liabilities totaling $110,000 because the Old Plan did not transfer any offsetting assets.  But under the Old Plan's interpretation, the Old Plan comes out even in accordance with *Mar-Can*:  it wipes $110,000 in liabilities from its books, gives away $70,000 in assets, and North Star's withdrawal liability to the Old Plan associated with those transferred liabilities is reduced accordingly by $40,000.  *See* 722 F. Supp. 3d at 372-73, 376-77.  And the New Plan receives $70,000 in assets to offset the $110,000 in liabilities, resulting in net liabilities of $40,000 in accordance with § 1415's purpose.  *See* 2 Employee Benefits Guide § 32.02(f) ("The effect is that the transferee plan assumes net liabilities equal to the lesser of the withdrawal liability that the employer would have had to the transferor plan or the value of the transferred employees' nonforfeitable benefits.") (citing 29 U.S.C. § 1415(g)(1)).

As the Old Plan argues, and the Court agrees, North Star's interpretation results in a lopsided transfer that is in tension with § 1415's framework.  (*See* D's Opp. at 7-8.)  Under the

first example, North Star receives a reduction to its withdrawal liability to the Old Plan more than double its initial withdrawal liability, and that reduction would apply against liabilities that were not transferred under § 1415 – that is, North Star's redetermination and reallocation liabilities with respect to the Old Plan.  While the PBGC describes § 1415(c) as a "relief" provision for employers the employees of which change their bargaining representative and will participate in a new plan, the relief is limited "to the extent the old plan transfers unfunded liabilities for which the employer will be responsible to the new plan."  *Mar-Can*, 722 F. Supp. 3d at 377 (citing Op. Ltr. 86-7 at *1).  Because § 1415 transfers liabilities only in connection with the employer's active employees, *see T.I.M.E.-DC*, 756 F.2d at 946; *Mar-Can*, 722 F. Supp. 3d at 372-73, 77; *Hoeffner*, 2016 WL 8711082, at *8, North Star's interpretation results in a § 1415(c) reduction that extends beyond the statute's intended relief, *see* Op. Ltr. 86-7 (employer's withdrawal liability to the old plan "reduced [under § 1415(c)] to the extent the plan sponsor transfers to the new plan unfunded vested benefits allocable to the employer"); Op. Ltr. 87-12 at *2 ("If, following a transfer of liabilities to a withdrawing employer's plan, the employer's withdrawal is determined to have been part of a mass withdrawal (or to have occurred within the same year as a mass withdrawal), the employer may become liable to the multiemployer plan for additional amounts (over and above its initial withdrawal liability) under section [1399(c)(1)(D)] of ERISA and the PBGC's regulation . . . .").  A reduction intended to enable the employer to fund its obligations to the new plan, *see Mar-Can*, 722 F. Supp. 3d at 375-77, would instead result in the employer subsidizing the old plan.  It simply cannot be that Congress intended or envisioned that the happenstance that a § 1415 transfer occurs in proximity to a mass withdrawal would result in a windfall to the old plan, and arguably the employer, at the expense of the new plan.

Nor does North Star's interpretation comport with the purpose of § 1415's relevant provisions: "to avoid double payments and keep both plans funded, Section 1415 requires that after the transfer, the employer pays the plan that will be carrying the unfunded liabilities." *Mar-Can*, 722 F. Supp. 3d at 377; *see T.I.M.E.-DC*, 756 F.2d at 945-46 ("The goal of the withdrawal and transfer provisions of the MPPAA is to ensure that the employer covers its pension obligations in both the old and the new plans. . . . The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. . . . It ensures that both plans are funded and avoids the possibility of double payments by the employer."). Rather, North Star's interpretation underfunds the New Plan and permits the Old Plan to retain $70,000 in assets – a result that conflicts with § 1415's function as discussed in *T.I.M.E.-DC* and *Mar-Can*. Thus, I decline to adopt North Star's interpretation, as it would amount to an anomalous, if not absurd, result.

Accordingly, for the reasons set forth above, I deny North Star's motion for partial summary judgment to the extent it seeks an order requiring the Old Plan to include the value of North Star's redetermination or reallocation withdrawal liabilities in § 1415(g)(1)'s calculation of the "appropriate amount of assets" to transfer to the New Plan under § 1415.

### C. Request for Attorneys' Fees

North Star seeks an award of attorneys' fees and costs under § 1451(e) for the time spent on preparing its pre-motion letters and the instant motion, (*see* P's Mem. at 15-16), assuming that it would be the prevailing party because "[t]he Old Plan . . . lacks any credible basis for refusing to follow the plain language of Section 1415(g)(1) in calculating the assets to be transferred" and "lacked any credible basis for refusing to execute the Section 1415 transfer for three years, until [North Star] finally sued in federal court for relief," (*id.* at 15).

33

Section 1451(a)(1) provides:

> A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.

29 U.S.C. § 1451(a)(1). Section 1451(e) "provides that the court may award all or a portion of the costs and expenses incurred, including attorney's fees, to the 'prevailing party' in connection with any action relating to a multiemployer plan," except that a fee award is mandatory when a fund obtains a judgment recovering withdrawal liability payments. *United Plant & Prod. Workers Loc. 175 Pension Fund by Kilkenny v. J. Pizzirusso Landscaping Corp.*, No. 20-CV-2527, 2022 WL 4139160, at *6 (E.D.N.Y. Aug. 9, 2022) (citing 29 U.S.C. § 1451(e)). The district court exercises its discretion to award any fees under this section. *See id.*; *Div. 1181, Amalgamated Transit Union – N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, No. 13-CV-9112, 2018 WL 4757938, at *2 (S.D.N.Y. Oct. 2, 2018). The court must consider "'whether a party has obtained some degree of success on the merits,'" *Div. 1181*, 2018 WL 4757938, at *2 (quoting *Donachie v. Liberty Life Assurance Co. of Bos.*, 745 F.3d 41, 46 (2d Cir. 2014)), but also may consider the following additional discretionary factors:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* (addressing 29 U.S.C. § 1132(g)(1)); *see United Plant*, 2022 WL 4139160, at *6 (sections 1132(g)(1) and 1451(e) governed by the same factors). "Although fees may be awarded to either

party, it is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." *Div. 1181*, 2018 WL 4757938, at *2.

Because North Star has not obtained a degree of success on the merits regarding the interpretation of § 1415(g)(1) – the sole issue before this Court on this motion – I deny North Star's request for a discretionary award of attorneys' fees.

Likewise, to the extent that North Star seeks attorneys' fees and costs as a sanction under Rule 11, (*see* P's Mem. at 15-16), the Court denies that request because there has been no showing that North Star has complied with Rule 11(c)(2). That Rule provides, as relevant:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

Fed. R. Civ. P. 11(c)(2). Here, North Star has not filed a separate motion for Rule 11 sanctions, nor is there any indication that it has complied with Rule 11(c)(2)'s safe harbor provision. "Any motion seeking Rule 11 sanctions that does not comply with these provisions must be denied." *Cole v. Stephen Einstein & Assocs., P.C.*, 365 F. Supp. 3d 319, 335 (W.D.N.Y. 2019) (collecting cases).[16]

In any event, the Old Plan's position does not rise to the level of sanctionable conduct as envisioned by Rule 11. "When a party's legal contentions are challenged as violating Rule 11, the operative question is whether the argument is frivolous, *i.e.*, the legal position has no chance

---

[16] The Court also declines to issue sanctions pursuant to its inherent powers. *See Pelczar v. Pelczar*, No. 18-CV-6887, 2019 WL 13223736, at *2 n.2 (E.D.N.Y. July 19, 2019) (where moving party failed to follow Rule 11's procedural requirements, invoking inherent powers to sanction "would have the unwanted and undesirable effect of rendering Rule 11's separate motion and safe harbor provisions meaningless").

of success, and there is no reasonable argument to extend, modify, or reverse the law as it stands." *Black v. Ganieva*, No. 21-CV-8824, 2022 WL 2354916, at *13 (S.D.N.Y. June 30, 2022); *see Weiss v. David Benrimon Fine Art LLC*, No. 20-3842, 2021 WL 6128437, at *2 (2d Cir. Dec. 28, 2021) (summary order) ("To constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend the law as it stands."). "The inquiry is one of objective unreasonableness and is not based on the subjective beliefs of the person making the statement." *Weiss*, 2021 WL 6128437, at *2. Even if it turns out that a higher court finds that this Court is incorrect in agreeing with the Old Plan's position, the Old Plan's arguments can hardly be said to be so frivolous as to warrant sanctions. Indeed, nor can North Star's, given the absence of binding (or any) precedent on point. Thus, even if North Star had complied with Rule 11(c)(2)'s requirements, I would still deny its request.

### D.    Stay Pending Arbitration

North Star requests that the Court stay this action pending the outcome of arbitration involving challenges to North Star's reallocation and redetermination withdrawal liability assessments. (*See* P's Mem. at 16-17; P's Reply at 10.) The Old Plan consents to this request. (*See* D's Opp. at 16.) Thus, the Court stays this action pending the results of the parties' arbitration regarding the mass withdrawal liability determinations. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. Logan Transp. Sys., Inc.*, 293 F. Supp. 3d 336, 351 (E.D.N.Y. 2018) (directing parties to arbitrate remaining issues with withdrawal liability assessments and staying case pending arbitration).

**IV.     <u>CONCLUSION</u>**

For the reasons stated above, Plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part.  The Old Plan shall transfer pension assets and liabilities to the New Plan pursuant to 29 U.S.C. § 1415 – determining the appropriate amount of assets to transfer under 29 U.S.C. § 1415(g)(1) in accordance with this Opinion – and calculate the corresponding reduction in North Star's withdrawal liability.  Plaintiff's request for attorneys' fees and costs is DENIED.  This action is STAYED pending the outcome of the parties' arbitration regarding withdrawal liability assessments.  The parties shall submit a status report within seven days of the arbitrator's decision.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 21, 25),[17] and to stay the case.

**SO ORDERED.**

Dated: March 18, 2025
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

_____

[17] ECF No. 21 is a letter motion involving the same issue addressed in this Opinion.